# EXHIBIT A



1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

December 18, 2018

**SENT VIA EMAIL (OFAC.Reconsideration@treasury.gov)**

Hagan Barnett
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Freedman's Bank Building
Washington, D.C. 20220

Re:   **November 29, 2018 Meeting Follow Up**
       *Mohamed Ibrahim Bazzi*

Dear Mr. Barnett:

Thank you for the time that you, Assistant Director Jennings, and other staff members took to meet with us regarding Mohamed Ibrahim Bazzi's ("Bazzi") designation under Executive Order ("E.O.") 13224. This letter memorializes the representations that we made during the November 29, 2018 meeting, and formalizes our request for a Terms of Removal Agreement from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC").

As you are aware, we approached OFAC following an investigation of the bases of Bazzi's designation. That investigation revealed two things. First, the conduct alleged by OFAC, which we find exaggerated in some instances, abated at least more than five years ago, and in some cases over ten years ago. Second, the U.S. Government was aware of the cessation of that conduct as Bazzi was a source for U.S. law enforcement until at least March 2017. Accordingly, our investigation shows that given the particular circumstances of this case, there is no opportunity to demonstrate a change in circumstances to negate any basis of designation. This is because alleged circumstances underlying Bazzi's designation had already changed, and the U.S. Government was already aware of the relevant changes, prior to Bazzi's designation.

Further, during the meeting we noted our deep concern about the *ad hominem* attacks made against Bazzi in OFAC's designation press release. Specifically, that press release describes Bazzi's behavior as "despicable," and includes the assertion by Secretary Mnuchin that Bazzi's acts were "savage and depraved." Given that OFAC's allegations relate to financial dealings he had with certain parties prior to their designations—including maintaining an alleged joint line of

credit, owning a car company, and helping establish banking or business relationships—the hyperbole of the press release distorts the facts and connotes a clear negative bias towards Bazzi. The presence of those misrepresentations and exaggerations in the record raises real concern that it may now be difficult or impossible for the actual facts of this matter to be fairly and objectively evaluated through the administrative reconsideration process.

Thus, as we represented to you, we believe that the likelihood of litigation is high in this case, and therefore wanted an opportunity to discuss the circumstances that led us to that conclusion.  We also represented that Bazzi wants to find an expeditious path forward for his delisting in a manner less adversarial than through litigation, but that Bazzi cannot bear the traditionally long OFAC reconsideration process.

Furthermore, during the course of the November 29, 2018 meeting, we provided information in the following areas: 1) our understanding of the factual allegations that OFAC has made concerning Bazzi's designation; 2) the facts that demonstrate a change in circumstances concerning those allegations; 3) Bazzi's cooperation and meeting history with U.S. law enforcement; and 4) our request for a Terms of Removal Agreement.  Below we detail each of these areas.

To be clear, this is not a request for administrative reconsideration under 31 C.F.R. § 501.807.  If we can come to terms in principle on a Terms of Removal Agreement, Bazzi will then file a request for administrative reconsideration so that the case can be processed by OFAC pursuant to such an agreement.  This letter, and the representations contained in it, simply reflect the facts represented to OFAC during our November 29, 2018 meeting to facilitate further discussion with the agency about resolving this matter without litigation.  Therefore, neither this letter nor any of its representations should be included in any record being developed with respect to an administrative reconsideration of Bazzi's designation.  At such time that a formal request for administrative reconsideration has been filed, Bazzi may elect to re-file this letter in that process.

### I. Factual Allegations Underlying Bazzi's Designation

According to the Federal Register Notice announcing the designation, Bazzi was designated May 17, 2018 pursuant to E.O. 13224 § 1(c) for acting for or on behalf of Hizballah. OFAC's press release announcing Bazzi's designation, however, asserts that he was designated "…for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah." That language parallels the designation criteria found in E.O. 13224 § 1(d)(i), E.O. 13224 § 1(c).  Further, the press release alleges conduct that is immaterial to any relevant designation criteria.  For example, it notes Bazzi's prior relationship with Yayeh Jammeh who is designated under E.O. 13818 and alleges that Bazzi

2

maintains ties to the Ayman Joumaa Drug Trafficking and Money Laundering Organization designated under the Foreign Narcotics Kingpin Designation Act.

It is our understanding that the designation authority published in the Federal Register—i.e., E.O. 13224, §1(c)—is controlling, and thus Bazzi is designated for acting for or on behalf of Hizballah.  So far as we can discern, the factual allegations that OFAC has relied upon with respect to this designation criteria are as follows:

### A. Hizballah Financier

OFAC has alleged that Bazzi is a Hizballah financier who has for many years provided to Hizballah financial assistance and millions of dollars generated from his business activities.  Unlike the other factual bases described below, OFAC has not provided any explanation of how Bazzi is a Hizballah financier or how he provided it millions of dollars a year.

### B. Relationship to Abdullah Safi-Al-Din

OFAC has alleged that Abdallah Safi-Al-Din, Hizballah's representative to Iran, worked with Bazzi to reestablish a political relationship between The Gambia and Iran, and that between 2009 and 2010 they worked with the Central Bank of Iran to expand banking access between Iran and Lebanon.

### C. Relationship to Adham Tabaja

OFAC has alleged that Bazzi worked to provide funds to alleged Hizballah financier Adham Tabaja, with whom he held a joint line of credit.

### D. Relationship to Ali Charara

OFAC has alleged that Bazzi maintains ties to Ali Charara through shared ownership in Car Escort Services S.A.L. Off Shore.

### E. Relationship with or to Iran

The OFAC press release notes that Bazzi's designation was the third action that week in which OFAC designated terrorists connected to the Central Bank of Iran in actions following President Trump's decision to reimpose U.S. nuclear-related sanctions targeting the Iranian regime.  Treasury Secretary Mnuchin was quoted stating that "[t]he savage and depraved acts of one of Hizballah's most prominent financiers cannot be tolerated…including those with ties to the Central Bank of Iran."

*F. Association to Yahya Jammeh*

OFAC has alleged that Bazzi is a close associate of Yahya Jammeh.

*G. Connection to Ayman Joumaa Drug Trafficking and Money Laundering Organization*

OFAC has alleged that Bazzi has business ties to the Ayman Joumaa Drug Trafficking and Money Laundering Organization.

*H. Global Trading Group*

Concurrent with Bazzi's designation, OFAC designated Global Trading Group ("GTG") for being owned or controlled by Bazzi. OFAC's press release alleges that as of 2015, Bazzi—as owner of GTG—drafted two securities totaling approximately $1 million to operate and maintain two power plants in Lebanon.

## II. Changes in Circumstances

*A. Relationship to Adham Tabaja*

Bazzi's involvement with Tabaja was in fact limited to a dealing in land formerly owned by Adham Tabaja that had been seized from Tabaja by Middle East and Africa Bank ("MEAB"). MEAB originally offered that land for sale to three individuals: 1) Saleh Assi; 2) Abdel Karim Ahmad; and 3) Shawki Harb. Assi offered to sell half of his share in the offered land to Bazzi— approximately 25% of the total land at issue. Bazzi thought it looked like a good opportunity, and MEAB offered him a line of credit to facilitate that land purchase.

Later on, Bazzi and Abdel Karim determined that the land had initially been overvalued and developed their portions to increase the value. They further sought to refinance their holdings through Bank Al Tamwil. These events all took place long before Tabaja's June 10, 2015 designation. Thus, while it is true that Bazzi held a line of credit that was used to purchase land in which Tabaja had an interest or claim to, Bazzi did not give Tabaja millions of dollars, nor was the credit facility a joint line of credit.

*B. Global Trading Group*

Bazzi transferred full ownership and control of GTG to his son on August 8, 2018. Despite this fact, due to repercussions of Bazzi's designation, all operations of GTG have ceased at this time.

### C. Hizballah

When Hizballah took over the village of Bent Jbeil, Lebanon between 2000 and 2002, it requested that Bazzi convert a local Red Cross headquarters that he previously had helped build in the 1990s into some other type of facility.  However, Bazzi refused to assist Hizballah and insisted that the building should remain a health center.  That was the only direct request made by Hizballah as an organization to Bazzi, as well as his last interaction with Hizballah in that regard.

### D. Iran

Bazzi's last visit to Iran was approximately 10 years ago.  In 2006, he participated in Yahya Jammeh's Gambian delegation trip to Iran and made arrangements in The Gambia for an Iranian delegation to an Africa summit; a delegation that included then President Ahmadinejad.  At the time, the Central Bank of Iran ("CBI") told Bazzi that it wanted to invest in offshore banks, so he introduced the CBI to the Lebanese Canadian Bank ("LCB").  Thereafter, Bazzi believes that the CBI invested between $50-60 million in LCB.  Afterwards, the Governor of the Lebanese Central Bank contacted Mohamad Hamdoun—LCB's manager at the time—to warn him about issues between Iran and the United States and advised him to return the CBI's investment in full.  Hamdoun sought Bazzi's advice on the issue, and Bazzi advised him to return the funds.  These transactions all occurred between 2006 and 2007.

### E. Ali Charara

During his tenure as Consul General of The Gambia to Lebanon, one of Bazzi's duties was to strengthen foreign investment ties between Lebanon and The Gambia.  Ali Charara was one investor that he introduced to The Gambia, and who sought to enter the country's telecom sector.  However, Yahya Jammeh expelled Charara from the country in 2008, only allowing him back in 2011 under a new contract on terms more favorable to Jammeh for an internet gateway project with the Gambian Government.  One term was a loan by Charara to Jammeh of approximately $10 million, with two years of monthly installments of approximately $500,000.  Bazzi's only involvement in Charara's contract was to facilitate those monthly payments to Jammeh through Bazzi's Euro Africa Group Fransabank account in Lebanon, where the funds were remitted to Jammeh's "Foundation for Peace" account at Trust Bank Gambia.  All such payments occurred between 2011 and 2013.  Bazzi had no other relationship of any kind with Charara and has had no further dealings with him since 2013.

### F. *Yahya Jammeh*

Bazzi became Consul General of The Gambia to Lebanon in 2005. In the course of that relationship with Jammeh, Bazzi never entered into any joint ownership ventures with him. Jammeh was paranoid of everyone around him, and Bazzi did not want any type of engagement where Jammeh could accuse him of dealing behind his back. Bazzi acted impartially and did not enter into any partnerships with investors that he introduced to The Gambia. When Bazzi wanted to divest his own business interests in The Gambia due to soaring fuel prices in 2012, Jammeh threatened him and their relationship began to deteriorate. Their relationship finally ended in 2016 after the Gambian election fallout—but before Jammeh's designation. Bazzi is no longer the Consul General of The Gambia to Lebanon.

### G. *Abdallah Safi-Al Din*

When Bazzi traveled to Iran in 2006 as part of Yahya Jammeh's delegation, Manoucher Moutaki—the Iranian Foreign Minister at the time—introduced him to Abdallah Safi-Al Din. Safi-Al Din facilitated LCB's introduction to the CBI, but when he realized that there would be no financial gain from the introduction, he accused Bazzi and Hamdoun, LCB's Manager, of benefiting at his expense. At the same time, Safi-Al Din had asked LCB to facilitate a mortgage for his son, but Hamdoun had refused on the basis that he was a known conspirator of Hizballah. These were the only interactions Bazzi had with Safi-Al Din, and the relationship entirely ceased sometime between 2006 and 2007.

### H. *Ayman Joumaa and Ali Kharoubi*

Bazzi never dealt or communicated with Ayman Joumaa or his alleged associates, with the exception of Ali Kharoubi, whom he had known since 2008 for being active in Cotonou, Benin and with the Government of Benin. Kharoubi helped Bazzi secure land near a port in Benin to build a liquified petroleum gas terminal under a bid won by Bazzi. In exchange, Bazzi gave Kharoubi an ownership share, and he assisted in supplying equipment for the project. Before the project was finished, Kharoubi was designated on January 26, 2011. Following the designation, Bazzi sought to avoid any negative impact either to himself or the project and opted to sell the project in full to an entity named Trafigura.

Prior to the designation, Bazzi had also planned to start a used car business in the port of Brazzaville, Congo with Kharoubi. They registered the company name "Car Escort Services," but Bazzi pulled out after the designation and so the business was never stood up and did not have any operations. Thereafter, it has solely been a paper-entity. Attempts to dissolve the company have been stalled due to the inaction of Bazzi's attorney. Nonetheless, Bazzi has had no relationship of any kind whatsoever with Kharoubi since 2011.

### III.     Dealings with U.S. Intelligence and Law Enforcement

As mentioned above, Bazzi has had a series of meetings and other communications with members of U.S. law enforcement and intelligence agencies. The information that Bazzi shared with the U.S. Government closely tracks and resembles the allegations that OFAC relied upon to designate him, as described in Section I above. During the course of those meetings and communications—which occurred between 2014 and 2017—Bazzi informed U.S. officials about his activities, including to explain that those activities had ceased many years ago. Thus, even at the time of Bazzi's meetings with those officials, the conduct that OFAC relied upon to support his designation was historic in nature. This is important, as a plain reading of E.O. 13224 §1(c) makes it clear that the designation criteria requires conduct to be ongoing in nature.

In 2013, Bazzi and his company Euro-African Group began experiencing banking difficulties, as JP Morgan Chase was advising banks not to deal with them. A lawyer in Lebanon, Maroun Tabet, told Bazzi that he had contacted U.S. intelligence sources to sort out the issue with JP Morgan Chase quickly and effectively. Tabet and James Bacon, a U.S. lawyer that Tabet was coordinating with, first met with two officials from the Federal Bureau of Investigation ("FBI") sometime in late 2013 or early 2014. The meeting occurred in the United States.

The two officials at the U.S. meeting, Agent "Browning" and Agent "Brad," asked Tabet and Bacon to have Bazzi clarify issues and connections relating to Iran and The Gambia, and also asked general questions about Bazzi's knowledge of certain individuals. These individuals included Adham Tabaja, Ali Charara, Yahya Jammeh, Abdallah Safi-Al-Din, Kassem Tajideen, Mohamad Hamdoun, and Ali Kharoubi. These questions were fairly standard in nature—i.e., Do you know him? How? Any dealings? Know if they ever had businesses which were fronts for Hizballah?, etc. Following that meeting, Bacon and Tabet facilitated several in-person meetings between Bazzi and those FBI officials. Bazzi was willing to participate in these meetings because of his interest in protecting his business and showing his desire to cooperate with the U.S. Government.

Bazzi had approximately five to six in-person meetings with Agents Browning and Brad, some of which occurred over a period of two days. The first such meeting occurred in May 2014 in Amsterdam. An agent from the Drug Enforcement Administration ("DEA") was also present at that meeting. Bazzi believes that the DEA official was Special Agent David Carnevale, but that was the only meeting at which Bazzi recalls the DEA being present. Bazzi met again with the FBI in August 2014 in Amsterdam, and then a third time in November 2014 in Brussels. Most of the discussions that took place during those meetings concerned topics later reflected in the OFAC press release announcing Bazzi's designation—i.e., his relationships with the Central Bank of Iran, Adham Tabaja, Lebanese Canadian Bank, and Ali Kharroubi. During one of the meetings, the

agents requested that Bazzi ask Mehdi Sadri, an individual he knew in Iran, about a kidnapping that had occurred. Bazzi did so, and conveyed to the agents that the kidnapping victim was alive, although Bazzi does not recall who the kidnapped individual was.

During the first two meetings there were other U.S. officials present, but Bazzi does not recall their names, nor what agencies they represented. Tabet also was present at the first two meetings, but after the second meeting was told that he could no longer attend Bazzi's in-person meetings with the agents.

Following the third meeting, the agents asked Bazzi if he would visit the United States, and he agreed to do so. To facilitate this, the agents requested that Bazzi meet with a specific person at the U.S. Embassy in Brussels and obtain his visa there. He did so, and the authorizing official issued him an alien parole visa limited to New York for a visit period of 3 days. That visa was issued on February 18, 2015 and permitted his entrance prior to February 25, 2015. Despite his request to stay at The Peninsula Hotel, the FBI required Bazzi to stay at the JW Marriot Essex House New York.

When Bazzi arrived at JFK Airport, he was escorted by the FBI to that hotel. Bazzi believes the hotel was under "police management and protection," because many uniformed police officers were present. The FBI agents had also expressed concern that he might be discovered by other U.S. intelligence agencies, and when he asked to stay at The Peninsula Hotel, they suggested that agents of other agencies, especially the CIA, might be interested in capturing and interrogating him.

Bazzi stayed in New York for 48 hours and met both days with the same agents—each meeting lasted a few hours, with the agents asking a number of questions that Bazzi did not have answers to. During those meetings, the agents asked Bazzi if he would work and cooperate with them as an informant. In exchange, the FBI agents offered a number of guarantees, including that Bazzi would not be designated by OFAC. Indeed, a commitment that Bazzi would not be designated by OFAC was specifically raised in a number of the meetings, in particular by Tabet during the first two meetings.

Bazzi agreed to work with the FBI and to leverage his professional and personal networks to assist the U.S. Government. The agents informed him that they would send him a secret identification number as part of the protocol of becoming a protected informant. Bazzi, however, never received any secret identification number.

The agents and Bazzi met again in Brussels in August 2016, which turned out to be their last meeting. During that meeting, the agents subjected Bazzi to a polygraph examination which he agreed to participate in. During the course of that examination, Bazzi showed deception on two

questions pertaining to whether he had informed others about his contact with U.S. law enforcement or intelligence agencies.

Bazzi continued to communicate with the FBI until March 2017. The communication was usually conducted via WhatsApp messenger, and typically related to potential scheduling times and locations to meet, but the additional meetings that were discussed never occurred. Agent Browning was identified in Bazzi's messenger services as "Ahmed American 2."

### IV.   Request for Terms of Removal Agreement

In light of the foregoing, Bazzi is specifically requesting a Terms of Removal Agreement to be entered into that will set forth any actions or commitments by Bazzi that would satisfy OFAC that a delisting is warranted. This would include his not filing a lawsuit or publicly discussing his prior cooperation with U.S. intelligence and law enforcement agencies. In exchange, OFAC will agree to delist Bazzi within the next six months.

### V.   Conclusion

Thank you for your consideration. If you have any questions or require clarification as to any matter described above, please contact me at your earliest convenience.

Sincerely,

Erich C. Ferrari

9